MILLER, Appellant, vs. PAINE LUMBER COMPANY, LTD., Respondent.

*November 5—December 3, 1929.*
*April 4—June 23, 1930.*

For the appellant there were briefs by *Eberlein & Larson* of Shawano, and oral argument by *M. G. Eberlein*.

For the respondent there was a brief by *Bouck, Hilton, Kluwin & Dempsey* of Oshkosh, attorneys, and *Richmond, Jackman, Wilkie & Toebaas* of Madison of counsel, and oral argument by *John F. Kluwin* and *Harold M. Wilkie*.

The following opinion was filed December 3, 1929:

OWEN, J. This appeal raises the question of whether the court properly changed the answer of the jury to the question which found in effect that the defendant failed to furnish plaintiff a safe place of employment by reason of its failure to warn the plaintiff of the danger of doors falling off the trucks. Sec. 101.06, Stats., reads:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein

and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building, and every architect shall so prepare the plans for the construction of such place of employment or public building, as to render the same safe."

The question immediately arises whether a failure to warn of dangers incident to the performance of service constitutes an unsafe place of employment within the meaning of this statute. It is apparent that a warning concerning dangers incident to the performance of specific duties within a given place works no change upon the physical aspects of the place where the work is to be performed. If the place was unsafe before, it continued to be unsafe after, the warning. The effect of the warning is to apprise the employee of the dangers incident to the performance of the service so that he may exercise care and caution for his own safety, which he might not exercise were he insensible to the danger. A mere reading of the statute reveals the dominant purpose of the legislation to have been to impose upon the employer the duty to furnish employees with a safe place to work in a physical sense. This seems to have been the view which the court took of the statute in *Sadowski v. Thomas Furnace Co.* 157 Wis. 443, 146 N. W. 770, where it said, speaking of the statute, at page 447 : "the absolute duty was created of accomplishing physical results for prevention of industrial accidents," which idea is further expressed at page 450 in the following sentence : "It would be very difficult to say, as matter of law, when the physical conditions and acts requisite to fully satisfy the statutory requirements appear conclusively by evidence." True, the stat-

ute was not being examined in that case with this thought in mind, but from these expressions appearing in the opinion it is plain that the court then considered the statute as one dealing with physical conditions only.

The statute was given more specific consideration, as far as this question is concerned, in *Northwestern C. & S. Co. v. Industrial Comm.* 194 Wis. 337, 216 N. W. 485, where it was held that in interpreting the phrase "and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters," the doctrine of *noscitur a sociis* should be applied, and that the "every other thing" should be construed as meaning things of the same kind specifically recited in the statute immediately preceding its use, which are things relating to the physical situation of the place of employment. We hold that the duty to warn of dangers incident to the employment is not a duty imposed upon the employer by virtue of the so-called safe-place statute.

However, that duty exists independent of any statute, and the failure to perform such duty has long been recognized as a ground of the employer's liability to an injured employee. It is a common-law duty and it has been in no respect modified by the legislation we are considering.

The trial court changed the answer of the jury to this question on the ground that the situation in which plaintiff was set to work imposed upon the defendant no duty to warn the plaintiff of the dangers arising from doors falling off the trucks. Because the common law, though not the statute, imposed upon the defendant the duty to warn the plaintiff of the dangers incident to his employment under certain circumstances, it is necessary for us to consider whether the trial judge was correct in his view of the situation.

The trial court took the view, and it is so contended by

the respondent, that no duty to warn rested upon the defendant, because the danger of doors falling from the truck was as open and obvious to the plaintiff as to the defendant, and that the experience of the defendant furnished no reasonable ground for it to anticipate that an injury such as plaintiff sustained would result from such an occurrence. Though the plaintiff was a farmer and never worked at employment similar to that in which he was engaged at the time of the accident, nevertheless it must be assumed that he was cognizant of natural physical laws. He must be held to have known that if the top door of the truck became engaged with a door protruding from an adjoining truck load, it would be brushed from the top of his load and that by force of gravity it would fall; that it would be brushed to the back of the load where he was working, and that in such event it was quite likely to fall upon him. These things he certainly knew and the consequences he must have foreseen if he paused to consider. But he was not warned of any such danger. He had worked there ten days, during which time he had moved from 800 to 1,000 truck loads without anything of the kind happening. Neither his experience nor warnings from the defendant had encouraged a cautious or watchful disposition on his part. Now it affirmatively appears that such incidents do not frequently happen in the factory. However, that doors were occasionally brushed from the top of these loads does satisfactorily appear. A superintendent of the defendant testified that doors had been so brushed from the top of the truck loads about ten times during his experience of fifteen years in the factory, while a witness for the plaintiff testified that it had occurred about ten times in his experience in the factory of little less than two years. It matters little whether the greater credence be given to the evidence of the defendant or that of the plaintiff. From either it appears that although such accidents did

occur, they were very infrequent. Viewed in one light, it may be said that their infrequency imposed upon the defendant a greater duty to warn the plaintiff against such accidents. If they were of daily occurrence, the plaintiff would soon have had brought home to him from actual experience a knowledge of the dangers arising therefrom, in which case the warning would serve little purpose, as the danger would be as open and obvious to the plaintiff as to the defendant. While no doubt it was within the mental capacity of the plaintiff to arrive at the conclusion that a door might be brushed from the top of a truck, in which event it might fall upon and injure him, still there was nothing in the routine of his daily work to stimulate his reflections upon the subject. On the contrary, his experience tended to lend a sense of security to his position and to his work.

It is further contended that although the defendant was cognizant of the fact that doors occasionally fall from the top of these loads, still there was no reason for defendant to apprehend injuries such as plaintiff sustained: this because of the fact that no serious injury had ever before occurred. If we attribute to the defendant a knowledge of the same physical laws with which it seeks to charge the plaintiff, it must follow that it should anticipate that doors falling from a truck might injure one in plaintiff's position. We are led to the conclusion that whether there was a danger incident to plaintiff's employment, known to the defendant, but not so open and obvious to the plaintiff as relieved the defendant from warning him of its existence, was a jury question. We hold that the situation presented a jury question as to whether under all the circumstances defendant owed the plaintiff the duty of warning him of the danger.

We now come to the question of whether this issue was properly submitted to the jury, so that, although it was submitted on the theory that the duty was imposed by virtue of

the safe-place statute, all of the elements essential to impose the common-law duty were necessarily considered by the jury, and judgment should have been rendered in favor of the plaintiff on the verdict. The case was submitted on the theory that the duty to warn was imposed upon the defendant by statute. If so, the duty was absolute, if reasonably necessary to make the place of employment safe (*Van de Zande v. Chicago & N. W. R. Co.* 168 Wis. 628, 170 N. W. 259), and the jury was so instructed. This, however, is not the duty which the rule of the common law imposes on employers. That rule requires merely the exercise of ordinary care. The rule as applicable to this situation is well stated in *Montevilla v. Northern Furniture Co.* 153 Wis. 292, 296, 141 N. W. 279. It requires a warning "against dangers which an ordinarily prudent man may reasonably anticipate may occur, in the ordinary course of the servant's employment, and then only when the servant may reasonably be presumed to be ignorant thereof." Although the jury found that the failure to warn rendered the place of employment unsafe pursuant to the court's instruction relative to the absolute duty of the master to furnish a safe place of employment, and in such connection that "it is the duty of employers to warn their employees of any dangers known to the employer or reasonably to be apprehended by the employer that are incident to the employment of such employees," they might have found that ordinary care required such warning under the circumstances here presented. It seems apparent that the verdict cannot be treated as one finding the defendant guilty of a want of ordinary care by reason of its failure to so warn the defendant, and that a new trial must be had.

It seems proper that we should consider another question raised upon motion after verdict but not disposed of by the trial court because, by reason of its disposition of the question already discussed, it seemed unnecessary to do so. Prior

to the commencement of this action the defendant paid to the plaintiff the sum of $457.45, pursuant to which the plaintiff executed a receipt in full payment of all claims which he had against the defendant by reason of the injury sustained by him. Upon the trial plaintiff offered evidence tending to show that he was unable to read this receipt, and that its contents were represented to him to be a receipt for six months' compensation only. Pursuant to the issue thus raised the court submitted to the jury the following question: "Did the officers or employees of the defendant who had in charge the negotiations for the settlement of the plaintiff's claim, to induce plaintiff and his wife to sign the release designated Defendant's Exhibit No. 25, falsely represent to plaintiff and his wife the character and purpose of said release?" The jury answered this question Yes, and further found that the plaintiff relied on such representations at the time he signed the release. In an opinion written on the motions after verdict the court expressed the view that these answers were not sustained by the evidence in the case, and that even though judgment should not go for the defendant because there was no duty to warn, it would be necessary to set aside the answers of the jury to these two questions and render judgment in favor of the defendant in any event. There was no formal order entered, however, changing the answers of the jury to these two questions. It is now insisted that the judgment should be sustained on the ground that the verdict of the jury with respect to the fraud practiced in securing this receipt is not sustained by the evidence.

The jury first returned into court with a verdict in which the answer to the question above set forth was, "Misunderstood." The jury were directed to retire again for further deliberation and to answer the question Yes or No. As above stated, their final answer was Yes. While this court is not partial to contracts of settlement made with employees

with unseemly and often indecent haste for trifling amounts when their physical and mental condition was such that they were unable to intelligently comprehend what they were doing (*Schweikert v. John R. Davis L. Co.* 147 Wis. 242, 249, 133 N. W. 136), yet such settlements are favored in the law when fairly made, and such settlements cannot be impeached on the ground of fraud or mistake except on clear and convincing evidence beyond reasonable controversy. *Hanley v. Hines,* 176 Wis. 252, 186 N. W. 602. Nor is such a settlement to be overcome by a mere statement of the signer that he did not understand the nature of the document which he signed. *Rayborn v. Galena Iron Works Co.* 159 Wis. 164, 149 N. W. 701. If the only evidence in the case to establish fraud was the statement of the plaintiff that he did not understand the document which he signed, that would not be sufficient to impeach the receipt, and would present no jury question. However, the evidence of the plaintiff in this respect was corroborated by his wife and by the witness Carl Zemke, who testified that he was in the office when the settlement was made and the release signed; "that Mrs. Ockerman and another fellow was there; that Mrs. Ockerman told plaintiff that the receipt or release was to show that it was for the past time and that Mrs. Miller should report every week how he was getting along; that they would do better later on. Mrs. Ockerman said they were paying him compensation. Mrs. Ockerman said this is for past time that was past up to the 22d of December. From then on if Mrs. Miller would report they would do better. It was said that day that Mrs. Miller should write Mrs. Ockerman. Mrs. Ockerman wrote the address, I think it was, and handed it to Mrs. Miller. I saw that."

This receipt was dated December 22, 1925. It appears without dispute that beginning sometime during the following April Mrs. Miller wrote to Mrs. Ockerman at her personal address in Oshkosh two or three times a month, tell-

ing her of the condition of Mr. Miller and intimating in some of the letters at least that the defendant should make further payments. These letters were produced from the files of the defendant and introduced in evidence. However, Mrs. Ockerman denied ever having received any of these letters. Mrs. Ockerman at the time of the settlement and up to the 1st day of September following was in charge of the employment bureau of the defendant. She conducted the negotiations leading up to this settlement. Whether she made the representations that the receipt was merely for compensation or for the time up to the date of the receipt was a question upon which her evidence was in direct conflict with that of Mr. and Mrs. Miller and Carl Zemke. The fact that Mrs. Miller did write to Mrs. Ockerman regularly at her private address in Oshkosh concerning Mr. Miller's condition strongly indicates that she had secured that address from some source. Plaintiff's witnesses testified that Mrs. Ockerman gave her that address upon the day of the settlement and requested her to write concerning Mr. Miller's condition. Mrs. Ockerman's denial of having received these letters, in view of the positive proof that they were written to her at her private home and by her placed in the files of defendant and from time to time called to the attention of Mr. Nevitt, the manager of the defendant, must have greatly depreciated her testimony in the minds of the jury. There is great reason to believe that so far as Mr. Nevitt is concerned he intended the payment made to be in full satisfaction of plaintiff's demands against the Paine Lumber Company, and that there was no misrepresentation made by him concerning the nature of the receipt. The evidence, however, justified the jury in finding that Mrs. Ockerman misrepresented the nature of the receipt, and that plaintiff as well as his wife relied upon these representations in signing the receipt. We therefore think it would have been error on the part of the trial judge if he had set aside the findings of the jury upon this subject.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

The following opinion was filed April 29, 1930:

OWEN, J. (*on motion for rehearing*). In this case motions for rehearing were made by both appellant and respondent. Respondent's motion for rehearing was denied February 4, 1930. On the same date the appellant's motion for a rehearing was granted, for a reargument (1) Upon the general scope and purpose of sec. 101.06, Stats., with special reference to the question of whether it relates merely to the physical elements involved in an employment or place of employment, and whether it imposes a duty upon the employer to warn the employee of dangers incident to the work in addition to the duty imposed upon the employer in such respect by the common law. (2) Whether, if the only duty imposed upon the defendant to warn the plaintiff in this case was that of the common law, the issue was properly submitted to the jury by the special verdict in this case so as to justify the rendition of judgment thereon.

A reargument of these questions convinces us that the view expressed in the opinion, to the effect that sec. 101.06 relates only to the physical aspects of a place of employment, is too narrow and erroneous. Our attention is called to the fact that the bill as originally introduced in the legislature, eventuating in sec. 101.06 and associated sections of the statutes, dealt only with places of employment and devices and safeguards reasonably adequate to protect the life and limb of employees or frequenters of such places of employment and the premises connected therewith, but that, by the substitute amendment, the entire scope of the law was materially broadened. The manner and extent of such enlargement is sufficiently illustrated by a comparison of sec. 11 of the original bill with sec. 11 of the substitute amendment, which now constitutes sec. 101.06 of the Statutes. The original bill provided as follows:

"Every employer shall furnish a reasonably safe and hygienic place of employment for employees therein and for frequenters thereof, and shall furnish safety devices and safeguards reasonably adequate to protect the life and limb of every employee in or frequenter of such place of employment and the premises connected therewith, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of the employees therein and the frequenters thereof."

Sec. 11 of the substituted amendment provided as follows:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters."

The substitute amendment introduced into the bill the requirement that not only the place of employment shall be safe for employees, but that the employment itself shall be safe, and that the employer shall adopt and use such methods and processes not only reasonably adequate to render the place of employment safe, but also reasonably adequate to render the employment safe. It thus appears that while the original bill was limited to. requirements which would make the place of employment safe, the substitute amendment required the employment as well as the place of employment to be safe.

It is apparent that "safe employment" is broader in scope than a safe "place of employment." In fact, safe employment necessarily requires a safe place of employment. By introducing into the bill the element of safe employment, it is obvious that the legislature not only intended to but actu-

ally did broaden the scope of the subject matter with which it was dealing, and when it required the employer to "do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters," even the doctrine of *noscitur a sociis* cannot restrain the meaning of such words to the physical aspects of the place of employment alone, because the dominant subject in connection with which such words are used is employment which shall be safe rather than a mere place of employment which shall be safe.

A moment's reflection will indicate that a safe employment may require something besides a place of employment that is safe in a physical sense. To illustrate, it is not inconceivable that to render safe the employment of a track repairer in switching yards may require a warning of the approach of switching engines and cars. This has no relation to the physical conditions under which he is working, but may be absolutely necessary to make his employment safe. Safety of employees working upon a building where materials are being hoisted and moved about may require signals to advise them of and to guard them against movements dangerous to them of which they would not otherwise be apprised. Illustrations such as this could be multiplied to indicate that under myriad situations safe employment calls for something in addition to a safe place of employment in a physical sense.

We are satisfied that the injunction laid upon employers to "furnish employment which shall be safe for the employees therein," to "use safety devices and safeguards," to "adopt and use methods and processes reasonably adequate to render such employment safe," and to "do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters," cannot be limited to the inclusion of mere physical situations. We

therefore hold that this statute does impose upon employers the duty to warn employees of dangers incident to their employment, not absolutely, but when it is "reasonably necessary to protect the life, health, safety and welfare of such employees."

.This duty may or may not be the same as the duty imposed at common law to warn employees of dangers incident to their employment. This we do not attempt to analyze because, whether the rule be the same or not, it is now embodied in statutory language and requires such warning when "reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters."

In submitting those questions of the special verdict by which the jury found that the defendant failed to warn the plaintiff and that such failure was the proximate cause of his injuries, the jury were told "that it is the duty of employers to warn their employees of any dangers known to the employers or reasonably to be apprehended by the employers that are incident to the employment of such employees." This is not the duty which the statute imposes upon the employer. He is required to warn only when it is "reasonably necessary to protect the life, health, safety and welfare of such employees." Although our conclusion rests upon somewhat different considerations, it still appears that that portion of the special verdict upon which the liability of the defendant is predicated was not properly submitted to the jury, and our former mandate must be confirmed.

In their brief in support of their motion for rehearing appellant's counsel ask leave to amend the complaint by setting up the negligence of the fellow-servant who pulled the truck which Miller was pushing. We have no power to entertain this motion. It will be proper to make that motion in the trial court when the record is remitted to that court.

The fact that our mandate results in a new trial makes it

unnecessary for us to consider whether the case should be remanded with an opportunity to the trial court to grant a new trial in the exercise of discretion. Our consideration of the subject, however, leaves some doubt as to the power of the trial court to grant a new trial for such reasons in view of the fact that sixty days have elapsed since the motion was made, and by the provisions of sec. 270.49 the motion in that behalf is to be deemed denied. This provision of the statute seems to strip the trial court of power to pass upon such motions after *remittitur* of the case from this court. Although such power was apparently assumed in *Borowicz v. Hamann,* 189 Wis. 212, 221, 207 N. W. 426, we are disturbed as to its correctness. This power should not be left in doubt. The subject seems to be an appropriate one for the consideration of the Advisory (Rules) Committee.

*By the Court.*—Original mandate confirmed.

On June 23, 1930, a motion by the respondent that appellant's motion for a second rehearing be dismissed was granted, with $25 costs.